Zimmerman, J.
At the trial there was a sharp conflict in the evidence. Piotrowski, decedent’s husband and the administrator of her estate, was the principal witness for plaintiff as to the circumstances leading up to and immediately preceding the death. He testified that his wife was a young healthy woman; that, following the Caesarean section for the delivery of her third child (her two other children had been delivered in the same way), he arrived at the hospital shortly before three o’clock on the afternoon of August 7 and observed that oxygen was being administered to his wife from a tank. He was able to converse with her in a normal way. About ten o’clock that night, Dr. Corey, decedent’s attending physician and the superintendent and president of the board of trustees of the hospital, and another physician visited Mrs. Piotrowski, and Dr. Corey advised the nurse on duty, Mrs. Groff, to change the oxygen tank later on. About one a. m. on August 8, Dr. Corey returned, checked Mrs. Piotrowski and left. Shortly thereafter Mrs. Groff advised Piotrowski that the oxygen tank should be changed. She experienced some difficulty with the removal, saying that she was a little “rusty,” and accepted Piotrowski’s offer of assistance. The tank, still containing oxygen, was disconnected, and Piotrowski accompanied Mrs. Groff to secure a fresh tank located down a hall, some distance away. The *63 new tank was procured and Piotrowski wheeled it on a cart to his wife’s room where he connected it and started the flow of oxygen. He noted that his wife’s complexion was blue. Dr. Corey arrived soon afterwards, removed the tubes, carrying the oxygen, from Mrs. Piotrowski’s nostrils and advised Pio-. trowski that his wife had passed away.
In answer to the question, “Would you tell the jury your best approximation as to how much time elapsed between the moment that the nurse had taken the gauge off of the tank in her [Mrs. Piotrowski’s] room until the time you returned with the reserve tank?” Piotrowski stated, “Oh, it was a.good 20 minutes because it was approximately one o’clock when she came with the wrench to take these gauges off and my wife passed away at 1:35, that is the time that was stated by the hospital.”
A nurse’s aid, Rosemary Hall, and Mrs. Groff, called by plaintiff for cross-examination, both testified that Mrs. Piotrowski was in a very poor physical condition on the night of August 7, that she was getting oxygen continuously, and that the fresh tank of oxygen was immediately available. However, these witnesses, when confronted with the answers they had given to questions asked in depositions taken prior to the trial, admitted that the new tank of oxygen at hand may have been substituted for the old tank immediately prior to Mrs. Piotrowski’s death, but that the change-over would have consumed a period of only a few minutes — about five.
Further to maintain his case, plaintiff called Dr. Wold-man, a Cleveland physician specializing in gynecology and obstetrics, as an expert witness. In answer to a long hypothetical question based on Mrs. Piotrowski’s record at the Corey Hospital and to a large extent on the testimony given by Piotrowski that decedent had been deprived of oxygen for a period of about 20 minutes, Dr. Woldman replied:
“I believe there is a definite relationship between the cause of death of this patient and a lapse of her receiving adequate oxygen over a period of time. ’ ’
Then the physician gave the reasons for his answer. On cross-examination he expressed the opinion that a deprivation of oxygen for even five minutes would have baused death.
*64 Called by the defense on direct examination, Mrs. Groff testified:
“Q. How long would you judge, and this would have to be an estimate, that it took you and Mr. Piotrowski to walk from her room out to where the tanks were and to get the tank on the cart and bring it back and put it outside the door of her room? A. Couldn’t take more than two or three minutes. Í t & * #
“Q. Tell the jury what you did and what happened after you came back from getting the tank of oxygen and went back into Betty’s [Mrs. Piotrowski’s] room. A. I walked back into the room with the intention of taking the gauge off of the tank to prepare to put the full one on. When I did, when I got into the room, Mrs. Osborne [a nurse’s aid] nudged my arm and told Mrs. Piotrowski’s color was bad, so I took her pulse and couldn’t get any and I sent Mrs. Osborne to get Dr. Corey.
“Q. Was the oxygen from the old tank still operating and going to Mrs. Piotrowski when you came back in the room from being out with Mr. Piotrowski? A. Yes, it was.
“Q. Did you at any time get any tank disconnected there that evening? A. No, I didn’t.
“Q. Did Mr. Piotrowski either that evening or later in the evening or any time ever say anything to you about the delay in changing the oxygen tank or having trouble shutting off the gauge or anything of that nature? A. No, he didn’t.
“Q. Do you recall what time approximately Mrs. Osborne came on duty that night? A. Well, it was sometime after midnight because we were busy, we had other patients and Mr. Piotrowski was going to go home, he had been there all afternoon with his wife, he was tired and he was going to go home and we felt she was not in any condition to be left alone, somebody had to stay with her because she was pulling the oxygen tube out of her nose if she wasn’t watched, and we also had a patient in labor, aside from the other patients on the floor, so we felt we needed extra help.
“Q. Mrs. Osborne came and was the extra help to be with Mrs. Piotrowski? A. That’s right.”
*65 Mrs. Osborne, a nurse’s aid, also a witness for tbe defense, testified that sbe was called to the Corey Hospital on the night of August 7, 1956, as a special attendant for Mrs. Piotrowski because of her critical condition. She testified:
“Q. Was she getting oxygen that evening? A. Yes, she was.
“Q. How do you know she was getting oxygen that evening? A. Well, a little bubble in the oxygen gauge there was moving, the little ball.
“Q. Would you indicate to the jury on this tank what you mean by something moving? A. When your tank is going this little ball here bounces up and down, moves, at whatever it is set for [indicating].
“Q. While you were in her room there that evening was this little ball you are talking about bouncing up and down? A. Yes, it was.
“Q. Where was the tube leading from this tank connected? A. It was in her nostril. i Í # # #
“Q. Do you recall on that evening Dr. Corey ever being there ? A. Dr. Corey was there.
“Q. About what time was that? A. Well, it was after I got there, probably one o’clock, something like that, or maybe a few minutes before or a few minutes after.
“Q. Following Dr. Corey being there, do you recall any period after that time when you were there alone with Mrs. Piotrowski? A. When Mrs. Groff and Mr. Piotrowski went down the hall after another tank of oxygen, a new tank, I was there alone with Mrs. Piotrowski.
“Q. Will you tell the jury what occurred or if anything happened while you were there alone with Mrs. Piotrowski? A. Well, I was standing there noting whether the oxygen was going and there is not much you can do when everything has been done and all of a sudden she roused a little bit and her eyes and her hands flew up and she kind of stiffened and I thought I better go up there and get her hands down and get the tubes out of the way and when I looked into her eyes I knew that she wasn’t there, she was gone.
“Q. Was there any noise connected with any of this of any *66 nature? A. Well, she had been breathing rather heavily but regularly at this time she started a gasping or 'rattling like she had a throat full of phlegm; I guess they used to call it the ‘death rattle’ an awful rattling noise.
“Q. What next happened? A. Well, I heard Mrs. Groff and Mr. Piotrowski coming up the hall with the tank of oxygen * # ^
“Q. Did Mrs. Groff come into the room? A. Yes.
‘ ‘ Q. What did you do and she do ? A. She turned her back to me, I was standing halfway down the bed, moved a step to make room for her when she brought the tank in, and she started, took the wrench and started monkeying with the top of the oxygen tank to unscrew it and I nudged her finally to see if she could get her pulse.
“Q. Did she try to? A. She did but she couldn’t.
“Q. What did she do then? A. Told me to go and call Dr. Corey, which I did.”
As a witness for defendant, Dr. Corey testified as to his medical training and experience, and that since 1949 he had probably performed some 150 to 200 Caesarean sections. He stated that in his studied opinion Mrs. Piotrowski died of a pulmonary embolism. However, he admitted that an autopsy, which was not performed, would have been necessary to verify definitely such diagnosis. Dr. Corey testified further that to the best of his knowledge Mrs. Piotrowski was continuously supplied with oxygen up to the time of her death, and that her husband had never complained to him about any lack of oxygen being furnished her. On cross-examination, Dr. Corey’s attention was called to the August 1958 issue of the Ohio State Medical Journal, published by the Ohio State Medical Association, where there appeared, beginning at page 1058 and under the heading, “Case No. 192,” a short outline of Mrs. Piotrowski’s case furnished by Dr. Price of the Corey Hospital staff, wherein the cause of death was listed as a pulmonary embolism. Following such outline, there were several comments by a committee of unidentified physicians and by an unidentified consultant specializing in thoracic and cardiovascular surgery. The committee, in its comments, deplored the lack of detailed in *67 formation concerning the examination of the patient and the lack of other authentic information. Because it was assumed that the patient was in good health and condition prior to the operation, the committee concluded that the presence of an embolus as a cause of death was no more than conjectural. Under the circumstances, which included the information before the committee that the patient’s first Caesarean section was complicated by postoperative bronchopneumonia, the committee questioned the choice of the anesthetic administered to the patient but, on the facts presented, voted the death a non-preventable “maternal” one. In the separate and distinct comments of the consultant he opined that “to blame pulmonary embolism as a cause of sudden death without postmortem examination is fraught with danger.” Then he described other conditions which might be responsible for the death. Somewhat later on, in reference to case No. 192, the following appears, attributable to the consultant:
“A history of bronchopneumonia following the initial section should weigh heavily in one’s choice of anesthesia. Spinal anethesia does not obviate pulmonary complications but does lessen their incidence. In addition, strenuous postoperative positive pressure breathing, forced laughing, aerosolization of antibiotics and the parenteral administration of antibiotics should have been given as a routine upon awakening rather than waiting until the patient became symptomatic. The value of endotracheal intubation for endobronchial suction as well as oxygenation should be kept in mind if general anesthesia is undertaken. The rapid onset of symptoms in this patient within 2-1 hours of delivery makes the diagnosis of pulmonary embolism doubtful. Aspiration pneumonia or bronchopneumonia would seem much more likely, and on this basis I believe the death was preventable by changes both in anesthetic techniques and in immediate postoperative care.”
On cross-examination, Ur. Corey was then interrogated and he answered as follows:
“Q. Did you ever read the conclusions of the Ohio State Medical Committee of the Maternal Health and their consultant with reference to the facts which you submitted? A. Yes.
“Mr. Leyshon: Objection.
*68 “Court: Apparently he saw them because he just read them.
“Q. Prior to today, Doctor? A. Yes.
“Q. You did? A. Yes.
“Q. And what you have read here is the opinion of that committee? A. Yes.
“[Plaintiff’s exhibit 15, being August, 1958, Ohio State Medical Journal, was marked for identification.]
“Mr. Dworkin: I offer in evidence plaintiff’s exhibit 15.
“Mr. Leyshon: Objection.
‘ ‘ Court: Sustained.
“Q. Then I will ask you whether or not you agree with this statement of the committee?
“Mr. Leyshon: Object to the statement of the committee being read before the jury.
“Mr. Dworkin: He said he agreed with the statements.
“Court: In substance if it is an abstract statement but we must bear in mind that defendant has no right to cross-examine, we have no witness here to cross-examine as to the statements or conclusions made here, so it would have to be guarded and it would only be general statements as to the medical procedure or conclusions.
“Q. Do I recall correctly that you agree with the statements of the committee with reference to the case which you read? A. Yes, sir.
“Mr. Dworkin: In light of that, can we renew our offer of this exhibit?
“Mr. Leyshon: Renew our objection.
“Court: As I understand it, Doctor, these are conclusions of the doctor that were reviewed of an abstract case or report of a case?
“Dr. Corey: Yes, sir.
“Court: Are you prepared to accept all the conclusions that are cited in this article relative to this case?
“Dr. Corey: I have long since.
“Mr. Dworkin: You said, ‘I have long since’?
“Dr. Corey: Yes, sir.
“Court: On that basis the exhibit will be admitted in evidence.
*69 “Mr. Leyshon: Objection.
“Mr. Dworkin: That is all.”
From the foregoing it is evident that confusion existed as to just what “conclusions” Dr. Corey accepted, whether it was the conclusion of the committee or the conclusion of the consultant, or both. In light of his other testimony, it is inconceivable that Dr. Corey would agree that “the death was preventable by changes both in anesthetic techniques and in immediate postoperative care.” And this was not one of the contentions of the plaintiff.
At any rate, this court is of the opinion that the admission in evidence of the Ohio State Medical Journal article as an exhibit over objection and with the comments favorable to plaintiff underlined in ink constituted error prejudicial to defendant. As has been indicated, there was a sharp dispute in the evidence, and on the evidence presented the jury could have decided either for the plaintiff or for the defendant. And it is not to be overlooked that the jury, by less than a unanimous vote, gave the plaintiff the whole $50,000 prayed for in the petition.
In the case of Hallworth v. Republic Steel Corp., 153 Ohio St., 349, 91 N. E. (2d), 690, this court reversed a judgment for plaintiff and held as stated in the second paragraph of the syllabus:
“Medical books or treatises, even though properly identified and authenticated and shown to be recognized as standard authorities on the subjects to which they relate, are not admissible in evidence to prove the truth of the statements therein contained.”
Such rule corresponds with the decided weight of authority which is to the effect that medical and other scientific treatises representing inductive reasoning are inadmissible as independent evidence of the theories and opinions therein expressed. The bases for exclusion are lack of certainty as to the validity of the opinions and conclusions set forth, the technical character of the language employed which is not understandable to the average person, the absence of an oath to substantiate the assertions made, the lack of opportunity to cross-examine the author, and the hearsay aspect of such matter. 20 American *70 Jurisprudence, 816, 817, Section 968, and 32 Corpus Juris Secundum, 627, 628, Evidence, Section 718.
An examination of the record in this case satisfies us that no other substantial errors occurred at the trial of this cause. Although we think the defendant is not entitled to final judgment in its favor as it requests, we do think it is entitled to the lesser relief of a new trial.
The judgment of the Court of Appeals is, therefore, reversed, and the cause is remanded to the Court of Common Pleas for further proceedings.

Judgment reversed and cause remanded.

Weygandt, C. J., Taet, Matthias, Bell, Herbert and O’Neill, JJ., concur.